UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.   Case No.: 8:17-cr-480-T-36JSS

KENYA ANTAUNBLACK STRONG
_____/

# **O R D E R**

This matter comes before the Court upon Defendant Kenya Antaunblack Strong's ("Strong") Motion to Suppress and Request for Evidentiary Hearing (Doc. 14). The United States of America (the "Government") responded in opposition (Doc. 19). An evidentiary hearing and oral argument was held on February 15, 2018. During the hearing, Deputy Bradley Garbutt ("Dpty. Garbutt") and Deputy Ricky Brock ("Dpty. Brock") testified on behalf of the Government. The Court, having considered the parties' submissions and being fully advised in the premises, will deny Strong's Motion to Suppress.

**I.   FINDINGS OF FACT[1]**

Dpty. Garbutt arrested an individual in connection with the sale of drugs. That individual agreed to cooperate as a confidential informant (the "CI"). Dpty. Garbutt met with the CI between March 20, 2017 and April 6, 2017. Doc. 24, Exh. 1. The CI provided Dpty. Garbutt with information that a black male known as "Ken" was selling large amounts of crack cocaine from his residence in the Manhattan Palms Apartment Complex (the "Complex"), located at 7210 Manhattan Avenue North, Tampa, FL 33614, and that "Ken" drove a gray Audi SUV. Doc. 24,

---

[1] The Court has determined the facts based on the testimony of witnesses and exhibits offered into evidence at the hearing held on February 15, 2018.

Exh. 1. The CI told Dpty. Garbutt that he had known "Ken" for "a while" and that he had previously bought crack cocaine from "Ken."

After receiving information from the CI, Dpty. Garbutt drove to the Complex in an effort to locate a gray Audi SUV. On April 5, 2017, Dpty. Garbutt went to the Complex and observed a gray Audi SUV parked in parking space number 329, in front of building number six and closest to unit numbers 621, 622, 611, and 612. Doc. 24, Exh. 1. On that day, Dpty. Garbutt contacted Tampa Electric Company and obtained the name "Kenya Strong" as the person responsible for the electricity in unit number 622. Doc. 24, Exh. 1. Dpty. Garbutt used this information to obtain a photograph of Strong from the Driver and Vehicle Information Database ("DAVID"). Doc. 24, Exh. 1.

While conducting surveillance at the Complex on April 5, 2017, Dpty. Garbutt observed a black male exit unit number 622. Doc. 24, Exh. 1. Dpty. Garbutt identified the individual as Strong from the photograph obtained from DAVID. Doc. 24, Exh. 1. Dpty. Garbutt observed Strong approach the gray Audi SUV, unlock the doors, and remove an item. Doc. 24, Exh 1. Dpty. Garbutt was unsure of what the item was, but believed it resembled a pair of headphones. Dpty. Garbutt next observed Strong leave the area on foot. Doc. 24, Exh. 1.

The next day, on April 6, 2017, the CI informed Dpty. Garbutt that Strong was going to deliver a large amount of crack cocaine to the CI. Dpty. Garbutt told the CI to set up the delivery for a specific location and time. Dpty. Garbutt then set up surveillance of unit number 622. Doc. 24, Exh. 1. At approximately 1:48 p.m., Dpty. Garbutt observed Strong park the gray Audi SUV in parking space number 329, exit the vehicle with a large round plastic bag in his right hand, and enter unit number 622. Doc. 24, Exh. 1. Dpty. Garbutt was not able to determine what was inside the bag. At approximately 3:12 p.m., Dpty. Garbutt observed Strong, wearing gym shorts and a

2

tank top, exit unit number 622 and proceed to the gray Audi SUV. Doc. 24, Exh. 1. Dpty. Garbutt observed Strong carrying some items, but could not determine what the items were and did not suspect the items were illegal substances. Dpty. Garbutt maintained radio communication with other deputies positioned outside of the Complex as Strong left in the gray Audi SUV. Those deputies maintained mobile surveillance of Strong. One or more deputies observed the gray Audi SUV crossing over solid yellow lines and driving onto a sidewalk, apparently in an effort to avoid traffic. Doc. 24, Exh. 1. Dpty. Brock was notified of the traffic infraction, and he conducted a traffic stop and asked Strong to exit the vehicle. Strong was stopped about a half-mile from the pre-determined location where he was supposed to deliver cocaine to the CI. Dpty. Brock proceeded to write a ticket for the traffic infraction. Tampa Police Detective Bryant and Canine Bo arrived on the scene and conducted a narcotics sniff. Canine Bo walked around the exterior of the vehicle and alerted to the seam between the driver's door and the left rear passenger door. Doc. 24, Exh. 1. Canine Bo then sat down on the back seat of the vehicle and placed his nose on the center console, alerting to the presence of narcotics. Doc. 24, Exh. 1. Dpty. Brock conducted a search of the area and found a clear plastic bag with a leafy green substance and a clear plastic bag with a yellow rock-like substance. Doc. 24, Exh. 1. The green leafy substance tested positive for THC, and the yellow rock-like substance tested positive for cocaine. Doc. 24, Exh. 1.

Dpty. Garbutt was advised of the events of the traffic stop. After Strong was arrested, Dpty. Garbutt and other deputies continued to surveil unit 622 to ensure no one entered or exited the unit. Dpty. Garbutt began writing an affidavit for a search warrant for unit 622. Dpty. Garbutt submitted the affidavit for approval by his supervisor and an assistant state attorney. After receiving approval, Dpty. Garbutt dialed the after-hours telephone number to reach the on-call duty judge. Dpty. Garbutt met Circuit Judge Catherine Catlin, who read the affidavit and signed the warrant

authorizing a search of Strong's residence located at 7210 Manhattan Avenue North, Unit 622, Tampa, FL 33614. The warrant was executed at about 8 p.m. on April 6th, 2017, at which time deputies located additional narcotics as well as ammunition. Doc. 14; Doc. 19.

A grand jury returned a two-count indictment charging Strong with intent to distribute a controlled substance within 1,000 feet of a school in violation of 21 U.S.C. §§ 860(a), 841(a)(1), and 841(b)(1)(B)(iii) and possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Doc. 1. Strong now asks the Court to invalidate the warrant authorizing the search of his residence and to suppress all evidence found as a result of that search.[2] Doc. 14.

## II. DISCUSSION

### A. Probable Cause

The Fourth Amendment guarantees "[t]he right of the people . . . against unreasonable searches and seizures" and directs that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. To deter "lawless police conduct," evidence seized in violation of the Fourth Amendment will be excluded in criminal prosecutions. *Terry v. Ohio*, 392 U.S. 1, 12 (1968).

In assessing the validity of a search warrant, a reviewing court may consider only "the information brought to the attention of the [issuing judge]". *U.S. v. Lockett,* 674 F.2d 843, 845 (11th Cir. 1982). An "affidavit must be read in a common sense fashion and great deference given to the [issuing judge's] finding which should be upheld in marginal or doubtful cases." *Id.* (internal citation omitted). "[T]he duty of a reviewing court is simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Illinois v. Gates,* 462 U.S. 213, 238-39 (1983) (internal quotation and citation omitted). Probable cause "is a fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *U.S. v. Brundidge,* 170

---

[2] Strong does not dispute the validity of the traffic stop or search of the vehicle.

4

F.3d 1350, 1352 (11th Cir. 1999) (quoting *Gates,* 462 U.S. at 232). Probable cause supporting a search warrant "exists when the totality of the circumstances allow[s] a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *Id.*

Strong argues that the search warrant is facially invalid because it lacks probable cause. Doc. 14. At the outset, Strong attempts to poke a number of holes in the affidavit by arguing that it lacks sufficient information to determine the CI's credibility or veracity and lacks sufficient corroboration of the CI's statements. Doc. 14. Strong cites to a number of Supreme Court and Eleventh Circuit cases, discussed below, in an effort to distinguish the facts in this case.

Incorporating these contentions, Strong ultimately and primarily argues that the affidavit in the instant case lacks probable cause because it does not connect Strong's residence to the alleged criminal activity. Doc. 14. Strong argues that the "mere fact" that contraband was found in the vehicle cannot support a search of the residence because if "such were the case, a traffic stop of any individual would give rise to probable cause to search that person's residence." Doc. 14. Strong also argues there can be no corroboration of the CI's statement that Strong sold cocaine from the residence, nor can there be any other link between the contraband found in the vehicle and the residence, because Dpty. Garbutt never saw Strong carrying any illegal substances to the vehicle. Doc. 14. In an apparent effort to bolster this point, Strong further argues the amount of contraband found in the vehicle (demonstrated in Doc. 24, Exh. 7) was too sizeable to be concealed in Strong's gym shorts and tank top and therefore could not have possibly been brought from Strong's residence during Dpty. Garbutt's surveillance. In response to Strong's arguments, the Government cites to a litany of case law to argue that the requisite nexus to the residence may be established from the circumstances, including expectation based on the prior experience and the common sense of law enforcement. Doc. 19.

5

In determining whether probable cause supported the search warrant, the Court considers only the information in the four corners of the affidavit and, for the moment, sets aside any additional investigatory facts learned in the evidentiary hearing.[3] *Lockett,* 674 F.2d at 845. In pertinent part, the affidavit sets forth the following: (1) Dpty. Garbutt has participated in investigations of persons for drug violations and has participated in executions of search warrants for narcotics during his employment with the Hillsborough County Sherriff's Office since 2009; (2) Between March 20, 2017 and April 6, 2017, Dpty. Garbutt met with a "source of information" who informed Dpty. Garbutt that a black male by the name of "Ken" was selling large amounts of crack-cocaine from his residence located in the Complex and that "Ken" drove a gray Audi SUV; (3) Between March 30, 2017 and April 6, 2017, Dpty. Garbutt circulated the Complex and observed a gray Audi SUV in front of building six, closest to unit numbers 621, 622, 611, and 612 and parked in parking space number 329; (4) Dpty. Garbutt determined the name of the person responsible for electricity in unit 622 was Kenya Strong; (5) Dpty. Garbutt identified a black male exiting the front door of unit 622 as Strong from a photograph obtained from DAVID; (6) Between April 5, 2017 and April 6, 2017, Dpty. Garbutt observed Strong approach and unlock the doors of the gray Audi SUV, as well as drive the vehicle; (7) On April 6, 2017, "information was relayed"[4] to Dpty. Garbutt that Strong was going to deliver a large amount of crack cocaine; (8) On April 6,

---

[3] During the hearing, Dpty. Garbutt testified that he usually gives a brief synopsis of the entire investigation while the issuing judge is reading the warrant. However, Dpty. Garbutt did not testify what other details he may have given the issuing judge in addition to those details presented in the affidavit. As far as the Court is aware, the only information brought to the attention of the issuing judge is the information presented in the affidavit. Accordingly, the Court will consider only the information in the four corners of the affidavit in determining whether probable cause supported the search warrant.

[4] During the hearing, Dpty. Garbutt testified that all of the information he received and incorporated into the affidavit was from the same CI. This is not clear on the face of the affidavit. *See* Doc. 24, Exh. 1.

2017, Dpty. Garbutt observed Strong exit unit 622 and enter and drive away in the gray Audi SUV; (9) Strong was observed crossing over solid yellow lines and onto a sidewalk, apparently in an attempt to avoid traffic; (10) A traffic stop was conducted and Canine Bo alerted to the presence of narcotics in the vehicle; (11) Dpty. Brock searched the vehicle and found a clear plastic bag with a green leafy substance, which tested positive for THC, and a clear plastic bag with a yellow rock-like substance, which tested positive for cocaine. In conclusion, the affidavit read:

> The information the source has provided to your Affiant [Dpty. Garbutt], even though untested, has been corroborated. The investigation . . . revealed Kenya Strong is residing within 7210 Manhattan Avenue North #622 Tampa, Florida 33614 and is selling Crack Cocaine and Marijuana from within said residence. Your Affiant [Dpty. Garbutt] has reason to believe the listed residence is being utilized to store and distribute illegal narcotics in direct violation of Florida State Statutes.

Doc. 24, Exh. 1.

### i. Confidential Informant

The Court first addresses Strong's arguments regarding the CI. In essence, Strong argues that the CI's statements, as relayed in the affidavit, do not support a finding of probable cause because the affidavit lacks sufficient information about the CI's credibility and veracity and lacks corroboration of the CI's statements. Doc. 14.

While an "informant's veracity, reliability and basis of knowledge are all highly relevant in determining the value of his report", these elements are not "entirely separate and independent requirements to be rigidly exacted in every case . . . ." *Gates,* 462 U.S. at 230 (internal quotations omitted). Once a source's information is corroborated by independent police work, the source's credibility, veracity, and basis of knowledge becomes less significant. *See Gates,* 426 U.S. at 244 (internal citation and quotation omitted) ("[C]orroboration through other sources of information reduce[s] the chances of a reckless or prevaricating tale thus providing a substantial basis for crediting the hearsay."). Indeed:

7

> Under the totality-of-the-circumstances analysis announced in *Gates*, veracity and basis of knowledge are no longer viewed as independent prerequisites to a finding of probable cause: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability such as corroborating evidence gathered by law enforcement.

*U.S. v. Foree,* 43 F.3d 1572, 1576 (11th Cir. 1995) (internal quotations and citation omitted).

It is clear that the affidavit here is lacking any detail with respect to the veracity, credibility, or source of knowledge of the CI. *See* Doc. 24, Exh. 1. The affidavit does not provide any information about who the CI is, how Dpty. Garbutt knows the CI, whether Dpty. Garbutt or other law enforcement officers had previously obtained information from this CI and whether any of that information proved credible or truthful, or the basis of the CI's knowledge about Strong's alleged drug activity. While the affidavit could have benefited from more detail in this respect, the deficiency is not fatal to a probable cause finding in this case due to law enforcement's corroborative efforts. Independent police work, including surveillance and record searches, verified the CI's statements that a black male by the name of "Ken" lived in the Complex; that "Ken" drove a gray Audi SUV; and that "Ken" was in possession of a large amount of crack-cocaine. Doc. 24, Exh. 1.

Strong urges the Court to conclude that the corroborative efforts of law enforcement in this case were insufficient as compared to the corroborative efforts underscored in certain other precedential cases, including *Gates,* 462 U.S. at 225-27 (law enforcement corroborated details of the defendants' unusual future travel arrangements upon receiving handwritten letter from an anonymous source that the defendants sold drugs) and *Draper v. U.S.,* 358 U.S. 307, 313 (1959) (law enforcement corroborated details of the defendant's future travel, clothing, and mannerisms from an informant, who had previously proven reliable, that the defendant was going to sell heroin). Strong's argument is not persuasive. To the contrary, the cases Strong cites tend to support

the sufficiency of law enforcement's corroborative efforts here. As in *Draper,* Dpty. Garbutt verified prior to executing the search warrant "every facet of the information given him . . . except [the question of the ultimate criminal activity.]" 358 U.S. at 313. In *Draper,* law enforcement confirmed details such as the defendant's clothing, mannerisms, and a scheduled travel arrangement before arresting and searching the defendant and finding heroin on his person. 358 U.S. at 309-10. Here, Dpty. Garbutt confirmed the identity of Strong, his residence, and the fact that he drove the gray Audi SUV. Doc. 24, Exh. 1. In addition, before applying for a search warrant of the residence, deputies were also able to independently confirm through the traffic stop that Strong was in possession of cocaine, the exact type of contraband that the CI stated Strong sold. Doc. 24, Exh. 1.

In *Gates,* law enforcement's corroboration of the defendants' identities and unusual travel plans were sufficient to issue warrants to search the defendants' vehicle and residence based on probable cause. 462 U.S. at 244. The Supreme Court upheld the validity of the warrants, reasoning that "[b]ecause an informant is right about some things, he is more probably right about other facts. . . ." *Id*. See also *Draper,* 358 U.S. at 313 ("And surely, with every other bit of [the informant's] information being thus personally verified, [law enforcement] had 'reasonable grounds' to believe that the remaining unverified bit of [the informant's] information—that [the defendant] would have the heroin with him—was likewise true."). Like in *Gates,* here, the relevancy of the lack of information about the CI was diminished once aspects of the CI's statement were verified through independent police work.

A relevant distinction between the facts here and those in *Draper* and *Gates* tends to disfavor Strong's position. In both *Draper* and *Gates,* the illegal drugs that were the subject of each tip were not discovered until the challenged search took place. *Draper,* 358 U.S. at 310;

9

*Gates,* 462 U.S. at 227. Here, deputies discovered Strong was in possession of illegal drugs prior to the execution of the challenged search warrant. Doc. 24, Exh. 1. In this respect, there is more independent corroboration and evidence available than in *Draper* or *Gates.*

### ii.     Nexus

As the parties agree, there must be some "nexus between the objects to be seized and the premises searched." *Lockett,* 674 F.2d at 846. Such a nexus can be "established from the particular circumstances involved and need not rest on direct observation." *Id.* Further, "a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence[,] satisfies probable cause." *U.S. v. Bradley,* 644 F.3d 1213, 1263-64 (11th Cir. 2011). "Evidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at their residence will support a search." *U.S. v. Anton,* 546 F.3d 1355, 1358 (11th Cir. 2008) (citing *U.S. v. Jenkins,* 901 F.2d 1075, 1080-81 (11th Cir. 1990)). "There need not be an allegation that the illegal activity occurred at the location to be searched. . . ." *U.S. v. Kapordelis,* 569 F.3d 1291, 1310 (11th Cir. 2009). Moreover:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

*Id.* at 1310 (internal citation omitted). However, "bare bones" affidavits presenting "mere conclusory statement[s]" that an affiant believes contraband will be found at a particular location will not suffice. *Gates,* 462 U.S. at 239 ("A sworn statement of an affiant that 'he has cause to suspect and does believe that' liquor illegally brought into the United States is located on certain premises will not do.") (quoting *Nathanson v. U.S.,* 290 U.S. 41, 54 (1933)).

In its response, the Government cites many of the above-referenced principles and cases to suggest that the search warrant was based on probable cause because common sense supports an inference of a nexus between a defendant's drug activity and his residence. Doc. 19. However, many if not all of the Eleventh Circuit cases the Government relies on have in common an element that is lacking here: a statement in the affidavit that the law enforcement officer's belief that contraband or evidence of the crime exists at the suspect's residence is based on the law enforcement officer's prior experience that suspects tend to store that particular type of contraband or evidence at the residence. *See, e.g., U.S. v. Joseph,* 709 F.3d 1082, 1100 (11th Cir. 2013) (Sergeant Franklin stated in his affidavit that "based on his knowledge, training, and experience, dealers often store at their home illicit cash proceeds, receipts, and other evidence of their crimes."); *Bradley,* 644 F.3d at 1264 ("[T]he affidavit further stated that, in the experience of the investigating agent, suspects commonly retained evidence of money laundering, tax evasion, and other financially-driven crimes in their homes . . . ."); *Anton,* 546 F.3d at 1358 ("The affidavit further noted that based upon the federal agent's experience, convicted felons and firearms dealers possessing contraband typically store these items on their property."); *Jenkins,* 901 F.2d at 1079-81 (affidavit to search residence relied, in part, on statement from veteran FBI agent that in his experience, people who steal money are most likely to take it to their homes for safekeeping); *U.S. v. Meryl,* No. 4:06cr39-SPM, 2006 WL 3544831, at *3 (N.D. Fla. Dec. 8, 2006), aff'd, 322 Fed. Appx. 871 (11th Cir. 2009) ("Investigator Gereg stated in the search warrant affidavit that based on his experience with narcotics search warrants over the past ten years, evidence of [the defendant's] drug activities would likely be found at [the defendant's] residence.").

Unlike in the above-referenced cases, the affidavit here does not explicitly provide the basis for Dpty. Garbutt's belief that narcotics would likely be found in Strong's residence. Doc. 24, Exh.

1. Although Dpty. Garbutt lists his law enforcement experience at the beginning of the affidavit, including his experience with drug-related crimes, he does not suggest that his prior experience investigating similar crimes is the basis for his belief that "the listed residence is being utilized to store and distribute illegal narcotics." Doc. 24. Exh. 1. Still, the distinction is likely pedantic;[5] as discussed above, a reviewing court need only find the issuing judge had a substantial basis for finding probable cause, including a "practical, common-sense decision whether, under all the circumstances set forth, there is a fair probability that contraband or evidence will be found." *Meryl,* 322 Fed. Appx. at 874 (citing *U.S. v. Butler,* 102 F. 3d 1191, 1198 (11th Cir. 1997)).[6]

The allegations supplied in the affidavit support a finding that there was a substantial basis for the issuing judge to make a common sense inference that there was a fair probability that evidence of drugs or drug activity was likely to be found at Strong's residence, even without an explicit statement from Dpty. Garbutt connecting such a conclusion with his law enforcement background. The relevant affidavit allegations include the details from the CI that Dpty. Garbutt was able to corroborate, specifically that a black male named "Ken" lived in the Complex; that "Ken" drove a gray Audi SUV; and that "Ken" was in possession of a large quantity of cocaine and marijuana. Doc. 24, Exh. 1. These allegations, alone, are sufficient to reach a common sense

---

[5] As the Supreme Court has recognized, "affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *Gates,* 462 U.S. at 235 (internal quotation and citation omitted).

[6] At least one circuit has taken the express position that "an affiant officer need not draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist." *U.S. v. Biglow,* 562 F.3d 1272, 1280 (10th Cir. 2009). "[Issuing] judges may draw their own reasonable conclusions, based on the [] affidavit and the practical considerations of everyday life as to the likelihood that certain evidence will be found at a particular place." *Id.* (internal citation and quotation omitted).

inference that evidence of drugs or drug activity were likely to be found at Strong's residence.[7] *See Anton,* 546 F.3d at 1358; *Jenkins,* 901 F.2d at 1080-81. An additional allegation supports the nexus between Strong's drug activity and the residence: Strong was found in possession of the cocaine and marijuana just after leaving his residence. Doc. 24, Exh. 1. *See, e.g., Meryl,* 322 Fed. Appx. at 874 ("[B]efore and after Meryl conducted a couple of drug transactions with a confidential informant, he was at his residence . . . .").

Strong's argument that no nexus exists because Dpty. Garbutt never saw Strong carrying contraband from his residence, as well as his argument that the amount of contraband found in the vehicle was too sizeable to be concealed in Strong's gym shorts and tank top and therefore could not have been brought from Strong's residence during Dpty. Garbutt's surveillance, is not persuasive. The Court will not describe the myriad of ways in which narcotics may be discreetly transferred from a residence to a vehicle. Regardless, whether Dpty. Garbutt witnessed Strong carrying narcotics or whether the cocaine and marijuana found in the vehicle actually even came from the residence is not conclusive because the nexus requirement does not necessitate direct observation or even an allegation that the illegal activity occurred at the residence.[8] *Lockett,* 674 F.2d at 846; *Kapordelis,* 569 F.3d at 1310; *Anton,* 546 F.3d at 1358 (citing *Jenkins,* 901 F.2d at 1080-81)).

---

[7] Strong's argument that the "mere fact" that contraband was found in the vehicle cannot support a search of the residence because if "such were the case, a traffic stop of any individual would give rise to probable cause to search that person's residence" is without merit; as explained above, in addition to describing the contraband found during the traffic stop, the affidavit described details given by the CI which were corroborated. The contraband found in the vehicle was clearly not the only evidence relied on in applying for the search warrant. Doc. 14; Doc. 24, Exh. 1.

[8] Here, the affidavit actually does contain statements that illegal activity occurred at Strong's residence. Doc. 24, Exh. 1. However, because those allegations are not needed to support the issuing judge's finding of probable cause in this case, the Court does not address their validity.

The allegations in the affidavit, including the CI's statements and Dpty. Garbutt's corroborating allegations, support a common sense inference that there was a fair probability that evidence of drugs or drug activity was likely to be found at Strong's residence. Accordingly, the issuing judge had a substantial basis for finding the affidavit was based on probable cause, and the Court will not disturb the issuing judge's probable cause determination.

**B.**     ***Leon* Good Faith Exception**

Even if the issuing judge did not have a substantial basis to conclude that the affidavit was supported by probable cause, there is little to no doubt that Dpty. Garbutt relied on the warrant in good faith as provided in the *Leon* good faith exception. *U.S. v. Leon,* 468 U.S. 897 (1984). The exclusionary rule—that evidence seized in violation of the Fourth Amendment may not be used in criminal prosecutions—is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *U.S. v. Martin,* 297 F.3d 1308, 1312 (11th Cir. 2002) (internal quotation and citation omitted). The exclusionary rule "is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause." *Id.* at 1320. An exception to the exclusionary rule, known as the *Leon* good faith exception, "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *Id.* at 1313. The *Leon* good faith exception applies in all but four situations:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing [judge] wholly abandoned his judicial role . . . . (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the

14

place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Id.* (internal citations and quotations omitted).

In his motion, Strong appears to argue that two of the four exceptions to the *Leon* good faith exception apply.[9] *See* Doc. 14. Strong relies on the same contentions discussed above to argue that the warrant lacks any indicia of probable cause such that Dpty. Garbutt's belief in its existence was entirely unreasonable. Doc. 14. However, as discussed above, the Court finds the issuing judge had a substantial basis for determining that probable cause existed. Accordingly, the Court cannot agree with Strong's argument that the affidavit was so lacking in an indicia of probable cause to render official belief in it entirely unreasonable.

Strong next attempts to argue that an insufficiency exists with respect to the issuing judge's approval of the warrant. Doc. 14. Strong does not explicitly argue that Judge Catlin "wholly abandoned [her] judicial role." Doc. 14. However, in similar fashion, Strong argues Dpty. Garbutt failed to obtain the opinion of a neutral, detached magistrate. Doc. 14. In summary, Strong argues that Dpty. Garbutt intentionally "solicited" the approval of Judge Catlin, a civil judge with no criminal law experience, who was not on duty that evening, in order to avoid review of the warrant by a neutral, detached judge. Doc. 14. Strong also cites Supreme Court case law for the proposition that an issuing judge must "not serve merely as a rubber stamp for the police" and must "manifest that neutrality and detachment demanded of a judicial officer". Doc. 14; *Aguilar v. Texas,* 378 U.S. 108, 111 (1964); *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326 (1979).

As an initial matter, there is no basis in fact for Strong's contention that Dpty. Garbutt sought out Judge Catlin, specifically, instead of an on-duty judge. At the hearing, Dpty. Garbutt

---

[9] Strong confirmed during the hearing that he does not contend that Dpty. Garbutt made any false statements in the affidavit or recklessly disregarded the truth.

testified that he did not ask for any particular judge or otherwise make any effort to seek out Judge Catlin; rather, he called the regular on-call duty judge telephone number and was connected to Judge Catlin. Moreover, Strong does not cite any case law for his apparent contention that a civil judge cannot serve as a neutral or detached judge in a criminal matter. Doc. 14. Strong also provides no evidence that Judge Catlin "rubber-stamped" the search warrant. Doc. 14. To the contrary, Dpty. Garbutt testified at the hearing that he watched Judge Catlin read through the warrant before signing it.

Nor can Strong rely on factual similarities between this case and *Aguilar* or *Lo-Ji Sales* to support an argument that Judge Catlin was not neutral or detached. The Supreme Court decisions cited by Strong turned on facts that differ significantly from the facts here. In *Aguilar,* the issuing judge signed the search warrant based upon a "bare bones" affidavit that contained only conclusions about what contraband the affiants believed may be located on the premises to be searched. 378 U.S. at 109. In *Lo-Ji Sales, Inc.,* the issuing judge was present for and participated in the execution of the search warrant. 442 U.S. at 323. Neither situation is similar to the instant case.

Because Strong presents no credible evidence that any of the four exceptions to the *Leon* good faith exception apply, the Court turns to whether Dpty. Garbutt could have reasonably relied upon the warrant such that the good faith exception would apply if, in fact, the issuing judge did not have a substantial basis for determining that probable cause existed in this case. *Martin,* 297 F.3d at 1318. The good faith exception requires that the Court consider "whether a reasonably well-trained officer would know that the warrant was illegal despite the [issuing judge's] authorization." *Id.* In making this determination, the Court may rely on information outside the

four corners of the affidavit, including information known to Dpty. Garbutt and other law enforcement that was not presented in the affidavit or search warrant application. *Id.*

In this case, as described above, Dpty. Garbutt and other deputies independently corroborated much of the CI's information: the identity of "Ken"; that "Ken" lived in the Complex; that "Ken" drove a gray Audi SUV; and that "Ken" was in possession of narcotics of the type that the CI described. Doc. 24, Exh. 1. This information, alone, would give Dpty. Garbutt reasonable belief that probable cause existed to execute a search warrant. However, additional information learned in the hearing about the CI, including his source of knowledge and his communications with Dpty. Garbutt, give further support to such reasonable belief. In the hearing, Dpty. Garbutt testified that he knew the CI because Dpty. Garbutt had previously arrested the CI in connection with the sale of drugs; the CI agreed to cooperate with deputies; the CI told Dpty. Garbutt that the CI had known "Ken" for "a while" and that he had previously bought crack cocaine from "Ken"; the CI was the same person who relayed information to Dpty. Garbutt on April 6, 2017 about Strong going to deliver a large amount of crack cocaine; Dpty. Garbutt told the CI to set up the delivery for a specific location and time; Dpty. Garbutt then surveilled the area of unit 622 and maintained radio communication with other deputies positioned outside of the Complex as Strong left in the gray Audi SUV; and Strong was stopped for traffic infractions about a half-mile from the area where he was to deliver cocaine to the CI.

The additional facts learned in the hearing lend support to Dpty. Garbutt's statements in the affidavit and further show the corroborative efforts of deputies. This is not a situation where law enforcement omitted details from the affidavit because those details did not support a finding of probable cause. *See Martin,* 297 F.3d at 1320. Under the totality of the circumstances, the Court

finds Dpty. Garbutt acted in objective good faith when applying for the warrant and reasonably believed that probable cause existed to execute the search warrant.

## III. CONCLUSION

Having conducted an evidentiary hearing on Strong's motion to suppress, and having considered the legal arguments of the parties, the Court finds there is sufficient information in the search warrant to determine that the issuing judge had a substantial basis for concluding that probable cause existed. The Court further finds that even in the event that the issuing judge did not have a substantial basis for concluding probable cause existed, the *Leon* good faith exception clearly applies and the evidence seized as a result of the search should not be suppressed.

Accordingly, it is hereby

**ORDERED**:

1. The Motion to Suppress (Doc. 14) is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on March 15, 2018.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any